Curia, per

Butler, J.
The assumption of the Circuit Judge, at the commencement of his report, doubtless founded on a correct judgment of the law, is important, and may be decisive of the questions that are involved in this case. In 1785, William Alston, the ancestor of the plaintiffs, had a perfect legal title vested and united in himself, of the five parcels of land that had belonged to separate owners, and which are designated in the plat of survey made by John Hardwick, 1 Feb. 1787. At that time, without an actual entry, he had a constructive possession of every foot of these contiguous tracts of land, and could *455 have maintained an action of trespass to try titles, against any one who may have committed a trespass within their limits; and the fact that Wm. Alston did not know, at the time of such trespass, of the extent and location of the actual boundaries of his land, would be wholly unimportant. The question now is, whether he had remained so long out of the actual possession under his title, as to enable another to acquire a good title under the Statute of Limitations, by virtue of a possession under a junior grant; and the time he may have remained out, must be determined by the inquiry, how long another has had an exclusive possession under a junior title. This inquiry seems to depend on the question, whether Wm. Alston had, from the time his tenants went on any part of the land, such an available possession as would enable him to hold co-extensively with his boundaries-; for if this should be the result, he would have a continuing and actual possession of all the land not actually occupied by another, under a posessiopedis for five or ten years (reference being had to the Act of 1824.) At what time Robert H. Collins, the defendant, took possession of tract No. 5, undernhis junior grants, does not appear from the report. It was assumed, in the argument, that the defendant’s possession commenced long after ’85, and after the tenants of Wm. Alston undertook to hold under his title ; so that when Collins went on the land in dispute, the tenants were in the actual possession of a parcel of land at the Yuhany ferry. They did not claim to hold any particular tract, and it is probable they were ignorant of the separate character, or rather separate designation, of the tracts; so far as it regards their landlord, they were in, as his general and unqualified tenants.
The presiding Judge remarks that the five tracts were not, in any of the deeds which were exhibited, described or mentioned as “one or adjoining.” It is certain, (the fact having been ascertained by actual survey,) that these tracts do join, and do form one contiguous body of land, and which were entirely united in one owner. So far as it regarded Wm. Alston, it was one entire tract. He derived his title through different sources, but it became connected with him by a single chain. The presiding Judge seems to think that Wm. Alston would have occupied a better po *456 sition if he had claimed under a grant for the entire tract made up by the sum of the different tracts. In my own view of the case, his position was in no wise different from that, from the time he had concentrated in him the united title. But there will be less difficulty on the subject, if the possession of Wm. Alston, by his tenants, can be made to refer to the plat of Hardwick; for if that plat was made at the instance of Alston, it would amount to an assertion on his part of his claim to an entire body of land, and it would be furthermore a good color of title to the extent that it called for.
There has been no question made but that that plat wTas a genuine paper; and I can perceive no reason why it should not be regarded by the court as what it purports to be; that is, that it is a plat of re-survey made out by a duly commissioned surveyor, who had actually run round the exterior lines, as, represented by him, and that it bears its true date. From its date, it would appear that it had been made out in 1787; about two years after Wm. Alston had acquired title in himself to all the land embraced in it. I grant, that it would not*follow from this, that the plat was necessarily made out for the then owner of the land. We should look to natural and probable conclusions, and when it has been ascertained that this plat was found among the papers of the plaintiff’s father, why not suppose it was made out for him, and that it was rightfully in his possession'? An opposite inference would be forced and unnatural, and such as would not be drawn by one out of a thousand. At least, we may regard it as highly ancellary to support and explain the united title of Wm. Alston to the five tracts of land ; and thus, therefore, from the time it was executed, these tracts constituted but one entirety, and might henceforth be identified as the Alston land. These views are fully sustained by the elaborate judgment of Judge Cheves, in the case of Brandon vs. Grimke, 1 N. & McC. 365. After combating an objection that had been made, in reference to the tract of land in controversy, that it could not be regarded an entire tract, because it was divided by the Tiger River, one part being designated as lying on the north and the other on the south of that river, the learned Judge notices another objection similar to the *457 one adverted to in the argument of this case, to wit: that the tract having been owned at one time in separate parcels, by two different proprietors, was incapable of being united. The language of the Judge is as follows : “In fact they were united, when Oliphant, claiming title under the grants to Cowden and Smith, united the whole interest in himself. In fact they were still more clearly and distinctly united when the plaintiff purchased the whole interest at the sheriff’s sale,” <fec.
So far then as it regards Win. Alston, in his life time, the parcel of land now in controversy formed a part of an entire body of land, whose interests and title were united in him, and I think that it will not be questioned, but that if Alston himself had occupied any part of the land, his possession would have been co-extensive with his exterior boundaries. The tenant may or may not be regarded in every respect as the substitute of his landlord; for the landlord may hold all his land by being in possession of a part, whilst he may assign to different tenants distinct portions or enclosures to be held by them for no more than they undertook by contract to hold. The contract of the tenant with the landlord, should determine the character and extent of his possession. This contract should have reference to the original entry of the tenant, and the fair and Iona fide reliance of the landlord on it. The good faith of the tenant should be commensurate with the just expectation of the landlord arising from the obligation of the contract establishing the relation between them. A tenant entering on land, with an understanding that he shall hold the entire possession committed to him, would be guilty of a breach of good faith and a culpable dereliction of duty, if he were wilfully to abandon the possession of a part, or by neglect were to suffer another to acquire an undue advantage. This would be something like the treachery of a tenant attorning to a stranger, and would certainly be a negligent disregard of a responsible trust. It becomes important, therefore, to enquire what was the nature of the contract by which Wm. Alston’s tenants entered upon and held the land of which they had actual possession at the Yuhany ferry. Was the privity of tenure in the first instance limited to a definite piece of land, or was the contract of *458 tenancy general and unqualified. I am inclined to the opinion that if it was not restricted in its origin to specific local limits, it must be regarded as a possession co-extensive with the lines called for by the title and plat of the landlord. The contract of the first tenant must give character to that of all who succeeded him. I extract from the notes of the presiding Judge, the evidence of Wm. M. Newton, who said he went to live at Yuhaney ferry in 1824 or 1825, as tenant of Col. Wm. Allston, and left there in April, 1832;. was succeeded by Woodward, as tenant. He stayed two or three years, and was succeeded by Elijah Cox, who acknowledged that he held as tenant. The witness said his father, living on the other side of the river, was the general agent of Col. Alston, and exercised a general supervision of his lands on both sides of the river. Would forbid trespasses, (fee. It seems from another part of hi» evidence, that he and his father being ignorant of where the lines of Col. Alston’s land run, attempted to trace them out, with a view of excluding intruders. They found the lines of one tract, (fee.
All the persons, without exception, who lived at Yuhaney ferry, and cultivated the adjacent fields, acknowledged themselves as the tenants of Col. Alston. So far as it regards Col. Alston, had he not every reason to believe that he was secure in the entire possession of this body of land upon which these persons acknowledged themselves as tenants 1 The tenants, themselves, seem to have held the land in reference to the authority of the general agent. They held each tract of land upon which they resided, as his immediate sentinel, to give notice of trespasses. Their possession was to be regarded as pro tanto, (that is, so far as-regarded each tract,) as his possession, for the purpose of protecting the land. The fact that they were ignorant of,, or mistaken as to the lines, could not control or weaken the legal character of their possession. Legally, it extended to the true lines, wherever they might run, as much se> as if Col. Alston had been on his lands himself, and had been ignorant of the extent of his boundaries. In such case his possession would run, and be identical with his. title. The case of Brandon and Grvmke will also illustrate, as authority, this part of the case. The plaintiff in *459 that case claimed the land in virtue of the possession of his tenants, who resided on and cultivated the land on one side of the river alone. Yet their possession was allowed to enure to the benefit of the plaintiff, and to secure the entire possession of the whole tract lying on both sides of the Tyger. The tenants’ possession was regarded as of the same efficacy of that of the landlord. According to these views, the land which is the subject of this action, was pre-occupied by Col. Alston before the defendant entered under his junior grant, and was not subject to the operation of the Statute of Limitations, except so much of it as defendant has held under possessio pedis for ten years. As to that under the authority of Huger and Cox, he may have acquired a good title; beyond that, unless the case should be materially changed on another trial, the defendant can claim no benefit under this verdict.
The general position upon which this judgment rests, is that a possession of a part under a definite color of title is possession of the whole, and that where there are two possessions on the same body of land, one under a senior and another under a junior grant, the senior title will prevail.
See the cases of Reed vs. Eifort, Williams vs. McGee, Brandon vs. Grimke, Huger vs. Cox.
Motion granted.
Richardson, O’Neall and Evans, JJ. concurred.